UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEPHEN L. GRANT,

        Plaintiff,

  v.                                       Case No. 17-C-1579

RICHARD HEIDORN,
PAUL SUMNICHT, and
MARY SAUVEY,

        Defendants.

## DECISION AND ORDER

Plaintiff Stephen L. Grant, who is currently representing himself and serving a state prison sentence at Columbia Correctional Institution, filed a complaint under 42 U.S.C. § 1983, alleging Defendants Richard Heidorn, Paul Sumnicht, and Mary Sauvey were deliberately indifferent to his serious medical needs. In particular, Grant asserts that from June 2009 to August 2016, Defendants refused to order an MRI or send him to an orthopedic specialist for his chronic left knee pain. On October 24, 2018, Defendants moved for summary judgment. After allowing Grant a number of extensions to respond to the summary judgment motion, Grant filed a response brief on April 3, 2019. He subsequently filed a motion for leave to file an amended brief opposing Defendants' motion for summary judgment. For the reasons that follow, Grant's motion for leave will be granted, Defendants' motion will be granted, and the case will be dismissed.

**BACKGROUND**

At all times relevant Grant was an inmate housed at Green Bay Correctional Institution (GBCI). Defendants were physicians working at GBCI during different time periods from 2007 through 2016.[1] Defs.' Proposed Findings of Fact, Dkt. 38.

During Dr. Heidorn's time as a treating provider for Grant from 2007 through October 2012, Dr. Heidorn treated Grant for his chronic pain conditions, including lower back pain and left knee pain. On June 10, 2009, Nurse M. Vanderkinter saw Grant in the Health Services Unit (HSU) for his left knee pain. Grant indicates that he told Nurse Vanderkinter that he injured his left knee while playing basketball during his confinement at Waupun Correctional Institution in November 1999. Grant reported that he no longer had a housing unit job and did not have access to ice to help with his pain. He requested ice, an orthopedic consult, and an MRI for his left knee. HSU staff advised that they would consult a physician for follow-up on his left knee.

Dr. Heidorn saw Grant regarding his increasing left knee pain on June 18, 2009. Dr. Heidorn observed that Grant's left knee had no effusion and that Grant resisted motion, claiming severe pain. Dr. Heidorn indicated that Grant's knee was stable. Dr. Heidorn did not order an MRI at that time because there was a lack of physical findings confirming any significant disease that would warrant an MRI. Instead, he diagnosed Grant with chronic knee pain; ordered an x-ray, laboratory, and non-steroidal anti-inflammatory drugs (NSAIDs); and advised Grant to continue his

---

[1] To the extent that Grant attempts to dispute Defendants' proposed findings of fact, he does so largely by making conclusory allegations and legal arguments. Because including legal arguments is improper, the court will disregard Grant's arguments in his responses to Defendants' proposed findings of fact.

home exercise program and to use a knee sleeve. Dr. Heidorn ordered x-rays to act as a baseline to evaluate the progression of the degenerative disease that existed in Grant's left knee.

Grant had an x-ray as ordered by Dr. Heidorn on June 25, 2009. The radiologist found an "unremarkable left knee" and recommended following up in two months. Grant had a second x-ray on July 9, 2009. The x-ray revealed mild degenerative changes with periarticular sclerosis and minimal narrowing of the medial joint compartment. There was no significant interval change. Grant had a third x-ray on March 25, 2010, which again revealed mild degenerative changes with periarticular sclerosis and minimal narrowing of the medial joint compartment. A small osseous protrusion was noted emanating from the proximal tibial shaft, which appeared stable. Based on these x-rays and his professional experience, Dr. Heidorn concluded it was not necessary to order an MRI for Grant because there was no evidence of significant degenerative joint disease or progression of his mild degenerative joint disease. On July 7, 2011, x-rays were taken which showed no significant change when compared to the March 25, 2010 x-ray. The x-ray revealed mild degenerative changes and minimal narrowing of the medial joint compartments in the left knee. Because the x-rays showed no significant changes and no progression of the degenerative disease in Grant's left knee, Dr. Heidorn did not order an MRI.

Although Dr. Heidorn did not order an MRI or request a referral with an offsite orthopedic specialist, Grant was consistently evaluated by health care providers. More specifically, HSU staff saw Grant a total of ten times for complaints related to his left knee pain. Dr. Heidorn treated Grant's complaints of pain through conservative measures. In treating Grant's mild degenerative disease in his left knee, Dr. Heidorn ordered that Grant be allowed to eat in his cell, have a lower bunk, have a no-kneel restriction, have extra blankets and pillows to prop his leg up at night, have

an extra mattress, and use ice as needed. Dr. Heidorn also prescribed medications including Meloxicam, Lisinopril, Atenolol, and Simvastatin. When Grant reported that the medications were ineffective, Dr. Heidorn changed the dosages and prescribed new medications in an effort to manage Grant's pain. Dr. Heidorn also ordered a physical therapy evaluation for Grant's chronic pain conditions. The physical therapy was discontinued on November 10, 2011, because Grant failed to cooperate in physical therapy, insisting that he needed an MRI and orthopedic evaluation.

Dr. Sumnicht transferred to GBCI in October 2012 and continued the ongoing plan of care for Grant's chronic left knee pain and low back pain. He first saw Grant at a February 11, 2013 appointment, and they discussed Grant's left knee and back pain. On examination, Grant had left leg weakness, which suggested back problems. X-rays of the back revealed disc problems that could pinch the nerves going to the knees. The left knee examination showed swelling outside of the knee on the lateral side but there was no internal damage to the cartilage, ligaments, or meniscus. Dr. Sumnicht diagnosed Grant with mild arthritis of the low back with disc degeneration and knee pain of many possible causes, including a medication side effect, sprain of the lateral knee, or pain coming down from the back. To assist in the diagnosis of Grant's knee pain, Dr. Sumnicht discontinued Grant's cholesterol medicine and ordered arthritis blood tests and a knee x-ray. Dr. Sumnicht prescribed Ibuprofen for pain and local knee swelling and Nortriptyline for chronic nerve pain from the back. He also continued the restriction that allowed Grant to eat in his cell, ice for pain relief, x-ray analysis, and NSAIDs. A February 14, 2013 x-ray revealed narrowing of the joint space due to mild degenerative changes, mild degenerative spurring involving tibial spine and femoral condyles, no fracture or dislocation, and no joint effusion. The x-ray also showed mild osteoarthrtis of the left knee.

4

Dr. Sumnicht saw Grant on March 21, 2013. At that appointment, Dr. Sumnicht noted that the x-rays showed mild arthritis. Grant's swelling was gone and his knee had not been "giving out." Grant did have a limp in his left leg and the tissue around his knee area was tender to palpation. With the left leg limp Grant experienced, Grant's body would not pump out the fluid in his legs, allowing fluid and waste products to build up. Dr. Sumnicht believed the fluid build up caused Grant's nerve pain and ordered compression stockings for the left calf muscles to help push the fluid out of Grant's leg and reduce pain. Dr. Sumnicht found no objective signs indicating that an MRI was required for Grant's knee. He prescribed Ibuprofen, Nortriptyline, and a local pain cream for Grant's left knee discomfort. Dr. Sumnicht also ordered an extra blanket for Grant's back pain and scheduled a follow-up visit for his low back pain.

Dr. Sumnicht saw Grant on May 2, 2013. He noted Grant's chronic back pain was worsening and his back x-rays revealed a progressive degenerative disc. Dr. Sumnicht ordered an MRI of Grant's lumbar spine, pending approval from the committee that approved off-site appointments. Because the x-rays of Grant's left knee showed only mild arthritis and that his degenerative condition was not worsening, Dr. Sumnicht did not believe it was objectively necessary to order an MRI for Grant's left knee. Dr. Sumnicht advised Grant that his left knee x-rays remained unchanged.

On June 17, 2013, Grant presented to an appointment with Dr. Sumnicht. Based on the spinal MRI, Dr. Sumnicht assessed Grant with L3-L4 spinal stenosis, which affected his activities of daily living. Dr. Sumnicht ordered an orthopedic spine referral, pending approval from the committee. Grant's greatest issue at that appointment was his lower back, so Dr. Sumnicht did not

assess Grant's left knee pain. Dr. Sumnicht did not have any further appointments with Grant prior to his leaving state service in August 2013.

From October 2013 through May 2016, Dr. Sauvey provided extensive medical care and treatment for Grant at 32 appointments regarding hypertension, degenerative disc disease with spinal stenosis of the lumbosacral spine, a positive cardiac stress test, chronic refractory pain, urinary retention, and his left knee pain. Grant complained of knee pain secondary to his severe low back pain at a July 18, 2014 appointment. At that time, neither an MRI of Grant's knee nor a referral to an orthopedist was clinically indicated in Dr. Sauvey's medical judgment. Instead, she ordered that Grant's knee could be iced twice a day for six months as needed and gave him an elastic wrap and lidocaine gel to apply to his knee. Grant contends that he never received the elastic wrap and returned the lidocaine gel after a few days because he did not believe it was helpful. Although Dr. Sauvey's medical notes do not reveal that Grant complained about knee pain at his appointments for severe back pain from August 26, 2014 through December 18, 2015, Grant contends that he complained about his knee at every appointment but that Dr. Sauvey would only treat his back pain.

On January 6, 2016, Dr. Sauvey saw Grant to discuss preoperative plans for his back surgery. At that appointment, Grant requested an MRI or orthopedic evaluation for his left knee. Dr. Sauvey's working diagnosis of Grant's knee problem was age-related mild to moderate degenerative joint disease. Her examination revealed no acute changes to his knee, so Dr. Sauvey prescribed ice, oral NSAIDs, and rest as needed. Although Grant did not agree with this course of treatment, he accepted the plan of care. In Dr. Sauvey's medical opinion, neither an MRI nor a referral to an orthopedic surgeon was required at that time because there was no clinical evidence

of any internal derangement of the left knee. She believed that Grant's lower back pain, which was Grant's more serious condition, could complicate the examination and treatment of his knee and pinched nerves in his back could have caused Grant's knee pain.

Dr. Sauvey saw Grant at 11 appointments between January 12, 2016, and March 25, 2016. Again, her medical notes do not indicate that Grant complained of left knee pain at these appointments, but Grant contends that he complained about knee pain at every one. On April 4, 2016, Grant presented to an appointment with Dr. Sauvey, complaining of left knee pain. Dr. Sauvey diagnosed Grant with degenerative joint disease of the left knee. She scheduled Grant for a follow-up with a neurosurgeon for the possibility of more rehabilitation from his recent back surgery, prescribed oral anti-inflammatories, gave him a knee sleeve, and scheduled him for a steroid injection of his left knee. In Dr. Sauvey's medical opinion, neither an MRI nor an orthopedic referral was medically necessary. If the more recent measures prescribed failed, Grant could be reevaluated. On April 11, 2016, Dr. Sauvey gave Grant a steroid injection in the left knee. She did not see Grant after this appointment, as she left GBCI the following month.

Dr. Tannan continued the ongoing care for Grant's chronic problems in June 2016. Dr. Tannan saw Grant on June 1, 2016, and diagnosed Grant with post-laminectomy syndrome, right sacroilietis, and degenerative joint disease of his left knee. Dr. Tannan referred Grant to advanced pain management for sacroiliac joint injections and ordered x-rays and physical therapy for the left knee. June 2, 2016 x-rays of the left knee revealed osteoarthritis with narrowing of the joint space. Following this initial appointment, HSU staff saw Grant on several occasions and gave him an extra pillow, ice packs, a cane, and NSAIDs. Grant also got an injection in his sacroiliac joint offsite.

7

Dr. Tannan saw Grant on August 31, 2016, for a follow-up appointment regarding his left knee pain and other pain issues. Dr. Tannan noted that Grant underwent a steroid injection in February 2016 without improvement. On examination, Dr. Tannan observed that Grant had limited range of motion in his left knee, that he had bony swelling from his degenerative arthritis, and that he had mild crepitus. Based on the examination and the June 2, 2016 x-ray, Dr. Tannan diagnosed Grant with degenerative arthritis in his left knee and ordered an MRI and orthopedic referral, pending approval from the committee. Dr. Tannan had determined that an MRI and an orthopedic referral were necessary at that point because past medical treatment had been unsuccessful.

An October 27, 2016 MRI revealed a complex degenerative tear of the lateral meniscus, anterior horn, body and posterior horn with some truncation of the posterior horn. The MRI also showed a joint effusion, tiny Baker's cyst, mild osteoarthritis, and severe chondromalacia in the lateral and patellofemoral compartment of the left knee. Dr. Tannan did not believe that Grant had an injury or precipitating event that caused any of the findings in the MRI and believed that they were caused by slow, gradual changes over time. Nothing in these findings required an emergency surgery or other pressing treatment.

Based on the MRI results, Grant went to an offsite orthopedic provider, Dr. Thomas Florek, on December 29, 2016. Dr. Florek noted Grant's left knee pain was secondary to fairly significant patellofemoral and lateral compartment arthritis with an incidental lateral meniscal tear which had failed to respond to prescription anti-inflammatories and a corticosteroid injection. Dr. Florek's working diagnosis was primary osteoarthritis of the left knee joint. Dr. Florek recommended administering steroid injections, ordered physical therapy for rehabilitation, and recommended a trial of Synvisc injection. He noted that, if Grant did not respond to these treatments, he would

recommend arthroscopy, rather than a total knee replacement. Despite Dr. Florek's conservative treatment plan, Grant's left knee pain persisted. June 5, 2017 x-rays showed moderate lateral compartment degenerative arthritis disease of the left knee with joint space narrowing of about 50%. These findings were consistent with degenerative changes over time. On August 18, 2017, Dr. Florek discussed arthroscopy and total knee replacement with Grant. Grant elected to have a total knee replacement of the left knee, which Dr. Florek performed on August 31, 2017.

**LEGAL STANDARD**

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's

safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. To prove a claim of deliberate indifference, the plaintiff must "establish that he suffered from 'an objectively serious medical condition' and that the 'defendant was deliberately indifferent to that condition.'" *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)).

Defendants assert that Grant has not established that he suffered from an "objectively serious medical condition." *Id.* A condition may be "objectively serious" if the failure to treat the condition would result in "further significant injury or the wanton infliction of pain" or where a reasonable doctor or patient would find treatment warranted. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). "It is clear that the Supreme Court contemplated that medical conditions far less critical than 'life threatening' would be encompassed by the term." *Id.* A broad range of medical conditions including "a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit" may be sufficient to fulfill the objectively serious element of a deliberate indifference claim. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Additionally, the Seventh Circuit has recognized that a serious medical need exists where a condition includes "chronic and substantial pain." *See Gutierrez*, 111 F.3d at 1373. Here, the court finds that the chronic pain caused by Grant's left knee suggests that he suffered from a serious medical condition.

Even if the court assumes that Grant had a serious condition, Grant must demonstrate that the defendants were deliberately indifferent to his medical needs. Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendants knew of, yet disregarded, an excessive risk to Grant's health or safety. *Farmer*, 511 U.S. at 835, 837; *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted). In this case, Grant asserts that Defendants were deliberately indifferent to his chronic knee pain because Defendants pursued a course of conservative treatment which they allegedly knew to be ineffective, and because they refused to submit a written request for review and approval of an MRI or orthopedic evaluation.

Taking Dr. Heidorn first, the record before the court indicates that Dr. Heidorn was anything but deliberately indifferent to Grant's knee condition. Dr. Heidorn first saw Grant for knee pain on June 18, 2009, where he diagnosed Grant with chronic knee pain, ordered an x-ray, and ordered NSAIDs. Dr. Heidorn ordered this x-ray so that it would serve as a baseline when tracking the potential disease that was plaguing Grant's knee. After that x-ray was found to be "unremarkable," Dr. Heidorn ordered two more x-rays, dated July 9, 2009, and March 25, 2010, each of which showed mild degenerative changes. A fourth x-ray was taken on July 7, 2011, which again showed no significant changes compared to the previous x-rays. Based on the results of the x-rays, Dr. Heidorn saw no reason to order an MRI or to request an orthopedic referral. In addition to ordering four x-rays, Dr. Heidorn ordered that Grant be allowed to eat in his cell, have a lower bunk, have

11

a no-kneel restriction, have extra blankets and pillows, have an extra mattress, and use ice as needed. Furthermore, Dr. Heidorn prescribed various medications, and when Grant indicated they were ineffective, Dr. Heidorn changed dosages, prescribed new medications, and even ordered physical therapy in order to manage Grant's condition. Dr. Heidorn's treatment methods were consistent with the standard of care and such methods "should be given a period of time to become effective" before considering another method. *Arce v. Barnes*, No. 1:13-cv-01777, 2015 WL 5567149, at *2 (S.D. Ind. Sept. 21, 2015). Dr. Heidorn did not "doggedly persis[t] in a course of treatment known to be ineffective," *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005), and he did not "knowingly expose [Grant] to a substantial danger to his health for no good reason." *Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001). In sum, Dr. Heidorn followed a course of treatment that was consistent with the standard of care, and he adjusted that course in an effort to better manage Grant's condition.

Continuing to Dr. Sumnicht, the record before the court indicates that he was not deliberately indifferent to Grant's knee condition. Dr. Sumnicht continued the same course of treatment that Dr. Heidorn began, but took further steps in an effort to treat Grant's condition. Dr. Sumnicht ordered another x-ray, performed a knee examination that revealed no damage to any muscle structures, and continued to prescribe Grant various medications to help manage the pain. Dr. Sumnicht also continued the restrictions that allowed Grant to eat in his cell and use ice as needed. Dr. Sumnicht went even further, however. Dr. Sumnicht ordered an x-ray of Grant's back which revealed disc problems that could have potentially been causing Grant's knee pain. As a result of the worsening back pain, Dr. Sumnicht then ordered an MRI of Grant's back which revealed L3-L4 spinal stenosis, again, a potential cause of Grant's knee pain. Dr. Sumnicht then

12

submitted an orthopedic spine referral for Grant in order to address the lower back problems. Throughout his treatment of Grant, Dr. Sumnicht saw no objective reason to order an MRI for Grant's knee because, based on a physical examination and similar x-ray results, there was no indication that there was any worsening of the knee condition. As was the case with Dr. Heidorn, Dr. Sumnicht did not "knowingly expose [Grant] to a substantial danger to his health for no good reason." *Egebergh*, 272 F.3d at 928. Rather, Dr. Sumnicht diligently treated Grant, discovering serious back issues and ultimately providing Grant with a referral to get those issues treated. There is no reason to believe that Dr. Sumnicht would properly treat Grant's back condition but be deliberately indifferent to Grant's knee condition. In fact, it is likely that Dr. Sumnicht believed that by solving the back issues, Grant's knee condition may improve. Dr. Sumnicht continued the course of treatment that was compatible with the standard of care, but took further steps to diagnose and treat Grant's condition.

Moving to Dr. Sauvey, the record before the court indicates that she was not deliberately indifferent to Grant's knee condition. As both Dr. Heidorn and Dr. Sumnicht did, Dr. Sauvey continued on a course of treatment consistent with the standard of care. Dr. Sauvey ordered that Grant be allowed to ice his knee, use elastic wrap, and apply lidocaine gel to help alleviate the pain in his knee. Dr. Sauvey's working diagnosis was that Grant's knee problem was age-related mild to moderate degenerative joint disease. As a result, Dr. Sauvey did not believe that an MRI was necessary, and further posited that Grant's back condition was far more serious, and could actually be the cause of the knee pain. After further encounters, Dr. Sauvey diagnosed Grant with degenerative joint disease of the left knee, and scheduled a follow up with a neurosurgeon regarding the possibility of more rehabilitation from Grant's recent back surgery. She also ordered Grant oral

13

anti-inflammatories, gave Grant a knee sleeve, and scheduled Grant for a steroid injection. Dr. Sauvey gave Grant his steroid injection, but did not see him after the appointment because she left GBCI the following month. As was the case previously, Dr. Sauvey did not "knowingly expose [Grant] to a substantial danger to his health for no good reason." *Egebergh*, 272 F.3d at 928. Nor did she persist in an ineffective method of treatment. Dr. Sauvey continued treatment that was keeping Grant's condition under control, and took additional steps by administering a steroid injection.

Defendants' actions in this case are not the only signs that they were not deliberately indifferent towards Grant's knee condition. Grant has also failed to provide evidence demonstrating that Defendants' treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision" on his or her medical judgment. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (citation omitted). In fact, doctors who are not parties to this case, Dr. Tannan and Dr. Florek, both followed the same course of treatment after Grant's experiences with Defendants. Dr. Tannan followed the same standard of care as Defendants; he ordered steroid injections, x-rays, physical therapy, an extra pillow, ice packs, and NSAIDs, all of which had been previously ordered by Defendants. It was only after a physical examination and x-ray of Grant's left knee showed that Grant's knee was worsening that Dr. Tannan ordered an MRI. After the MRI revealed a meniscus tear and other issues, Dr. Tannan still believed that the issue was not caused by an injury, but that it was caused by slow, gradual changes over time. Furthermore, following the MRI, the off-site orthopedic provider, Dr. Florek, continued a similar line of conservative treatment, including steroid injections, physical therapy, and Synvisc injections. As Dr. Tannan says in his declaration,

14

"[n]otably . . . Dr. Florek believed that a continuation of conservative treatment options was the standard of care at this time." Tannan Decl. ¶ 23, Dkt. No. 39. Dr. Tannan further noted that Dr. Florek did not recommend that Grant have immediate surgery, and that this demonstrated that the care given to Grant by Defendants was appropriate. *Id.*

Defendants' actions do not show any evidence of deliberate indifference, nor do they give rise to any inference of it. "An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quoting *Estelle*, 429 U.S. 107). Furthermore, the choice to refer a prisoner to a specialist "involves the exercise of medical discretion" and refusal to refer only supports a claim of deliberate indifference if that choice is "blatantly inappropriate." *Id.* (citations omitted). Defendants in this case clearly had objective medical reasons for pursuing the course of treatment that they did. This was further verified by the fact that doctors who are not parties to this case agreed with the treatment Defendants pursued. Although Grant may disagree with Defendants' preferred treatment methods, a mere disagreement with the medical staff's chosen course of treatment does not amount to deliberate indifference under the Eighth Amendment. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). In sum, Defendants were not deliberately indifferent to Grant's medical needs and summary judgment is appropriate in favor of Defendants.

**CONCLUSION**

Grant has failed to present any evidence on which a reasonable jury could find that any of the named Defendants acted with deliberate indifference toward his serious medical condition. For this reason and the reasons above, Grant's motion for leave to file an amended brief (Dkt. No. 57)

is **GRANTED** and Defendants' motion for summary judgment (Dkt. No. 36) is **GRANTED**. The Clerk is directed to enter judgment dismissing this case with prejudice.

**SO ORDERED** this  24th  day of June, 2019.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court